CONSTRUCTION INTERIOR SYSTEMS, INC., Plaintiff–Appellee,

v.

MARRIOTT FAMILY RESTAURANTS, INC., Defendant–Appellant.

Nos. 91–3330, 91–3373.

United States Court of Appeals, Sixth Circuit.

Argued March 20, 1992.

Decided Jan. 29, 1993.

Rehearing and Rehearing En Banc Denied April 2, 1993.

Larry A. Temin, Charles G. Atkins (argued and briefed), Strauss & Troy, Cincinnati, OH, for plaintiff-appellee.

Thomas E. Palmer (briefed), William A. Klatt (argued and briefed), Squire, Sanders & Dempsey, Columbus, OH, for defendant-appellant.

Before JONES and NORRIS, Circuit Judges, and JOINER, Senior District Judge.[*]

JOINER, Senior District Judge.

The defendant, Marriott Family Restaurants, Inc., appeals, and the plaintiff, Construction Interior Systems, Inc., cross-appeals the district court's judgment for Construction Interior Systems, Inc., in this diversity contract action based upon an alleged breach of a settlement agreement. For the reasons that follow, we reverse the judgment of the district court.

## I.

The plaintiff in this action is Construction Interior Systems, Inc. (CIS), a company engaged in refurbishing motel rooms. The defendant is Marriott Family Restaurants, Inc. (Marriott), a corporation which previously conducted business as the Howard Johnson Company (Howard Johnson). John Penker, CIS's president, and his associate, Lowell Cady formed CIS in 1979. From 1980–83, CIS performed 90 to 95 percent of its work for Howard Johnson. In 1983, a dispute, over an issue that remains unidentified in the record, arose between CIS and Howard Johnson. As a result, Howard Johnson removed CIS from its list of approved bidders for future work

[*] Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

and cancelled all then-current contracts with CIS.

CIS protested Howard Johnson's actions. The parties negotiated the dispute extensively and resolved their differences in a meeting. The terms of their settlement were set out in two letters: one dated January 24, 1984, sent by John Sterns, a vice president at Howard Johnson, to Penker, and one dated February 1, 1984, sent by Penker to Stearns. The parties agreed that CIS would release all claims that it had against Howard Johnson arising out of the cancelled contracts in exchange for Howard Johnson's promise of the following:

> We agree immediately to put you on the bidders' list for construction and rehab work. If after one year from this date you have not been the successful bidder on $300,000 worth of work, we agree to negotiate with you in good faith, subject to prevailing rates and quotes, for the performance by you of work which, together with the amount of work you may have been awarded during the prior year, would equal the sum of $300,000.

The parties further agreed that Howard Johnson could cancel any contract with CIS and again remove the company from the bidders' list if the work was not properly performed but that Howard Johnson would, in that event, pay CIS the sum of $15,000.

Marriott contends that Howard Johnson restored CIS to the bidders' list by early February 1984 just as it had agreed to do. Marriott insists, however, that every contractor on the bidders' list was not solicited for bids on every project; moreover, Marriott claims that solicited bids were evaluated based upon a number of factors, and projects were usually, but not necessarily, awarded to the lowest bidder.

On the other hand, CIS contends that it was one of the four primary bidders on Howard Johnson's list for motor lodge refurbishing work, that it had received invitations to bid on *all* such work for Howard Johnson in the past, and that it had been successful approximately 55 percent of the time. CIS alleges that because the bidders were pre-approved, Howard Johnson awarded contracts for the refurbishing work to the lowest bidder. Thus, in CIS's view, the settlement agreement provision requiring Howard Johnson to restore CIS to the bidders' list meant that CIS would have the opportunity to bid on all refurbishing work as it had before the dispute.

CIS did not receive an invitation to bid for motor lodge room refurbishment work in January or February of 1984. Defendant does not dispute this. In early March 1984, CIS attempted to reach Howard Johnson to find out what bids were upcoming. In late April 1984, Howard Johnson responded, apprising CIS of the fact that all 1984 refurbishment work already had been contracted. Penker then wrote to Robert Wickham, another vice president of Howard Johnson who had been involved in negotiating the settlement agreement, stating his regrets that all 1984 work had been awarded to other contractors. He further stated:

> Unfortunately, these circumstances suggest that we will not have an opportunity to re-establish a working relationship with your company for the major portion of this year as hoped and anticipated by our recent agreement. We wish to recommend therefore that our agreement be extended to cover the 1984–85 fiscal year in lie[u] of discussing any cash settlement necessary to terminate our agreement.

Wickham responded in May 1984, confirming that all 1984 work had been awarded and consenting to extend the agreement as Penker requested to cover the 1984–85 fiscal year.

By the spring of 1985, it became clear that the potential for Marriott Corporation to buy out Howard Johnson was great, and, as a result, all refurbishing work was put on hold until the new management came in to make decisions. By June of 1985, CIS apparently was aware of this situation—albeit from outside sources—as evidenced by a June 11 letter Penker sent to Stearns asking what impact all of these

events would have on the settlement agreement.

> Assuming that our knowledge is reasonabl[y] accurate and a sale could occur in 1985 we are concerned first that our settlement agreement will transfer and be recognized by any new ownership and secondly, that the agreement terms can be fulfilled in 1985 since a change in ownership could result in delays of renovation programs while a reassessment or restructuring period occurs within the Company.

Stearns responded that Howard Johnson intended for CIS to continue to receive bid invitations, with the hope that their former business relationship would resume.

In November 1985, Marriott Corporation purchased the stock of Howard Johnson, and Howard Johnson began doing business under the name Marriott Family Restaurants, Inc. Contemporaneously, the motor lodges were sold separately to a new and unrelated entity, Howard Johnson Corporation, Inc. (HJC), a wholly-owned subsidiary of Prime Motor Inns, Inc. All contracts specifically relating to the motor lodges were transferred, along with the lodges themselves, under an indenture of transfer. Additionally, HJC entered into an assumption and indemnity agreement pursuant to which it assumed all obligations and liabilities relating to the assets, including claims arising from contractual obligations undertaken or assumed by Howard Johnson during the time when it was the owner of the assets. In 1986, HJC accepted and awarded bids for the 1985 motor lodge refurbishment program, which had been held in abeyance by Howard Johnson pending the purchase of the company. CIS was on the bidders' list HJC obtained from Howard Johnson. CIS was the successful bidder on four of these 1985 projects, giving the contractor in excess of $495,000 worth of refurbishment work.

Defendant asserts that the $495,000 worth of work given to CIS by HJC was in satisfaction of the settlement agreement.

CIS complains to the contrary that from 1984 to 1985, *Howard Johnson*—as opposed to HJC—gave CIS only four invitations to bid on projects, two of which were not the type of work CIS was qualified to do. CIS was not the low bidder on the remaining two and was not awarded the project. CIS alleges that it was never reinstated on Howard Johnson's bidders' list, as CIS understood that term to mean, and that it never had the opportunity to bid on the 1500 rooms that constituted the 1984 refurbishment work or on the over 12,000 rooms that were in the 1985 and subsequent refurbishing programs. Cady, of CIS, alleges that on March 5, 1986, after Marriott had become the owner of the company, he spoke with David Vancura, the head of Marriott's architectural, design, and construction department, who told him that Marriott intended to work with only local, as opposed to national, contractors on refurbishment jobs in the future. During negotiations in an April 1986 meeting, a Marriott attorney, Mr. Peltz, said that he could not give Cady an answer about the settlement agreement at that time. Peltz later stated to Cady that "he could not do anything for [CIS]." CIS insists that this statement constituted a repudiation of the settlement agreement and that Marriott never offered to cure the repudiation.[1]

CIS filed suit in federal court, asserting that the settlement agreement was void and alleging claims relating to the originally disputed projects. The district court granted Marriott's motion for partial summary judgment on the ground that the settlement agreement between CIS and Howard Johnson was valid and constituted a full and complete settlement of all CIS's original claims. The district court held that any claims of CIS were limited solely to those based on the terms of the settlement agreement.

CIS amended its complaint, seeking damages for the alleged breach of the settlement contract. The named defendants were Marriott Corporation (parent corporation that purchased the stock of Howard

---

1. The precise title and scope of authority David Vancura had to speak for defendant in March 1986 is not clear from the record. Nor is it clear whether Cady and CIS understood at this time that HJC, not defendant, would be awarding motor lodge refurbishment contracts.

Johnson in 1985); Marriott Family Restaurants, Inc. (Howard Johnson doing business under a new name); and the new entity known as HJC (which purchased the motor lodges from the old Howard Johnson).

The defendants filed a motion for summary judgment on the grounds that (1) their obligations under the settlement agreement were satisfied because CIS received in excess of $300,000 worth of motor lodge refurbishment work; (2) if not, any potential damages recoverable by CIS must be limited to CIS's net profit on $300,000 worth of refurbishment work; and (3) the damages claimed by CIS were speculative. The district court denied this motion. The case was stayed as to HJC because it filed for bankruptcy; Marriott Corporation was dismissed. The case against Marriott (Marriott Family Restaurants, Inc.) was tried to a jury in November 1990.

The jury returned a general verdict in favor of CIS and awarded damages in the amount of $380,590. Marriott timely filed proposed findings of fact and law on its declaratory judgment counterclaim, along with a motion for judgment notwithstanding the verdict (j.n.o.v.) or, alternatively, a motion for new trial. The district court denied these motions.

Marriott raises a number of issues on appeal, contending that the district court erred: first, in denying its motion for a directed verdict or j.n.o.v. on the ground that its obligations under the settlement agreement were satisfied as a matter of law; second, in admitting parol evidence relating to the meaning CIS attached to various contract provisions because that evidence added to and contradicted the terms of the fully integrated, unambiguous settlement agreement; third, in leaving the application of the parol evidence rule to the jury; and, finally, in allowing the jury to calculate damages based in part on the number of motel rooms refurbished in 1984. CIS cross-appeals, contending that the district court erred in preventing it from presenting evidence concerning damages beyond the years 1984 through 1986.

For the reasons stated below, we conclude that defendant's obligations under the settlement agreement were satisfied as a matter of law in 1986 by CIS's receipt of over $485,000 worth of refurbishment work from HJC, and that defendant's motion for j.n.o.v. should have been granted.

## II.

The standard for granting a j.n.o.v. is the same as the standard governing a directed verdict. *Monette v. AM-7-7 Baking Co.,* 929 F.2d 276, 280 (6th Cir.1991); *Minton v. Southern Ry.,* 368 F.2d 719, 720 (6th Cir. 1966). Federal courts are required to apply the Ohio courts' standard for a directed verdict because Ohio's substantive law governs this action. *Potti v. Duramed Pharmaceuticals,* 938 F.2d 641, 645 (6th Cir. 1991). We have stated Ohio's standard as follows:

> Ohio courts require that a court presented with a motion for a directed verdict construe the evidence and all permissible inferences therefrom most strongly in favor of the party against whom the motion is made and consider neither the weight of the evidence nor the credibility of the witnesses in disposing of the motion. Such a motion will be granted only if, after considering the evidence in this light, there can be but one reasonable conclusion as to the proper verdict.

*Id.* (citations omitted). If reasonable minds could disagree as to whether Marriott had satisfied its obligations under the settlement agreement, then the district court was correct to deny Marriott's motion for j.n.o.v.

To make this determination, we start with an analysis of CIS's claims. The express language of the settlement agreement gave CIS two rights: first, to be put on the bidders' list, and second, to be awarded a total of $300,000 worth of work. According to CIS, being "put on the bidders' list" meant that it had the right to receive bid invitations on *all* of defendant's motel lodge refurbishment work, along with a legitimate expectation of being awarded a certain percentage of the work on which it bid. Further, according to CIS, the $300,000 figure mentioned in the settlement agreement was not the total amount

of work it was entitled to be awarded, but simply a guarantee of the minimum of work it was supposed to be awarded. To prove that the settlement agreement had this meaning (for even CIS does not contend that the agreement expressly states this), CIS sought to present evidence of its understanding of the phrase "put you on the bidders' list," and of its understanding of the intended obligations of the parties. The court allowed the admission of this parol evidence and, consistently with that ruling, charged the jury as follows:

> The parties have different views of what they were obligated to do under the Settlement Agreement. The plaintiff contends that Howard Johnson had two obligations under the Settlement Agreement. First, the plaintiff contends that Howard Johnson agreed to send the plaintiff invitations to bid for all motor lodge refurbishment work that Howard Johnson would undertake from that date forward as long as the plaintiff continued to perform the bid work according to bid plans and specifications. Second, if the plaintiff was not the successful low bidder on $300,000 worth of work during the first year, Howard Johnson had an additional obligation to negotiate with the plaintiff for the future performance of work that would equal a minimum of $300,000 worth of work.

In closing argument, CIS's counsel presented a calculation of damages based on the 1566 motel rooms requiring refurbishment work in 1984 on which CIS was not invited to bid. Counsel argued that CIS averaged an award of 44 percent of the contracts on which they had submitted bids in the past, which, at a total of $2006.58 per room, would have resulted in income of $1,382,614, and a gross profit of $411,708. A similar exercise calculated a lost gross profit of $541,801 for 1986. As noted above, the jury returned a general verdict in CIS's favor and awarded damages of $380,590.

■ CIS concedes that the district court found that the settlement agreement was fully integrated, and even now does not dispute this finding. The law in Ohio concerning the effect to be given to a fully integrated agreement is clear:

> Where the parties, following negotiations, make mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions.... *Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence.*

*Aultman Hosp. Ass'n v. Community Mut. Ins. Co.,* 46 Ohio St.3d 51, 544 N.E.2d 920, 923 (1989) (citations omitted; emphasis added). Even where a contract is not fully integrated, parol evidence cannot be admitted if its effect will be to vary or contradict any matter that is specifically covered by the written terms of the contract. *Id.* There can be no implied promises in a contract in relation to any matter that is specifically covered by the written terms of the contract. *Jost v. Burr,* 69 Ohio App.3d 354, 590 N.E.2d 828, 831 (1990) (citing *Kachelmacher v. Laird,* 92 Ohio St. 324, 110 N.E. 933 (1915) (syllabus ¶ 1), and *Aultman,* 544 N.E.2d at 923).

> Ohio law further provides that
>
> interpretation of written contract terms is a matter of law for initial determination by the court.... It is only when the relevant contract language is ambiguous that the job of interpretation is turned over to the fact finder ... and the determination whether a contract is ambiguous is made as a matter of law by the court.

*Potti,* 938 F.2d at 647 (citations omitted). Here, the district court decided that the written settlement agreement was ambiguous.[2] We review de novo a district court's legal conclusion regarding ambiguity. *Id.* Ohio law governs our determination re-

---

**2.** Although the court stated in its order denying defendant's motion for j.n.o.v. that it found the agreement to be ambiguous, this finding is contradicted by the jury charge which allowed the jury to determine whether the agreement was ambiguous, and then how any ambiguity should be resolved. As noted above, it is the function of the court, not the jury, to determine whether a contract is ambiguous.

garding the claimed ambiguity in the settlement agreement. Two recent cases from the Ohio Supreme Court are instructive.

In *Latina v. Woodpath Development Co.*, 57 Ohio St.3d 212, 567 N.E.2d 262 (1991), the court was required to decide whether a contract between a real estate developer and a home builder was ambiguous in its reference to the home builder having "the first right to purchase (or refuse to purchase) lots" in the project. The plaintiff home builder contended that the "first right to purchase" was the legal equivalent of a right of first refusal, which would have required that the developer present all other offers to buy the property to the builder, so the builder would have an opportunity to match the offers. The trial court allowed plaintiff to present expert testimony on the meaning which the plaintiff contended the contract language should have been given. The jury found that the contract language gave the plaintiff a right of first refusal, that defendant breached its obligations in this regard, and awarded plaintiff damages. *Latina*, 567 N.E.2d at 263–64.

The court of appeals reversed, and the supreme court affirmed the reversal, holding that the language "first right to purchase" meant precisely that—the first right to purchase, and did not mean a right of first refusal. The court stated that while expert testimony is admissible to show a special meaning given by the industry to language employed in a contract, the plaintiff's expert testified that "first right to purchase" had no meaning particular to the real estate development industry. Consequently, the words "first right to purchase" had to be given their ordinary meaning, which required a finding that the defendant had fully performed its obligations by granting the plaintiff the first right to purchase the property in question. *Id.* at 264–65.

In *Aultman*, the supreme court addressed a similar claim. The plaintiff in *Aultman* was a hospital association which had had a contractual relationship with the defendant and its predecessor, Blue Cross, for many years. Pursuant to the contract, the plaintiff provided medical services to subscribers who were issued service contracts by Blue Cross. The term "service contract" was defined in the contract to mean any contract Blue Cross was authorized to issue. The plaintiff contended that the language "service contract" allowed Blue Cross to issue only "traditional" service contracts, pursuant to which Blue Cross charged subscribers a set premium and made payments to the hospitals on a discounted basis for services rendered. Defendant contended that it was free to issue "nontraditional" service contracts, pursuant to which subscribers were issued group contracts, paid no premiums, but were charged by Blue Cross on a cost-plus basis for services rendered by the hospitals. Blue Cross paid the hospitals on the same discounted basis used in the traditional plan.

The Ohio Court of Appeals concluded that the contract definition of "service contract" was circular and ambiguous, and that the trial court properly allowed extrinsic evidence to explain the meaning of the term. "The court [of appeals] also essentially held that the nontraditional subscriber agreements were beyond the reach of the discount agreement between the parties and that the parties' written contract did not contemplate nontraditional service agreements." 544 N.E.2d at 922. The supreme court reversed, relying on the test it had previously announced for determining whether contract language is ambiguous. "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* at 923 (quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (syllabus ¶ 2), 374 N.E.2d 146 (1978)).

Applying this test, the court held that the term "service contracts" was unambiguous, and that the admission of extrinsic evidence was improper. According to the court, the construction of contract language urged by the plaintiff "would not be a construction at all but would amount to the making of a new contract for the par-

ties which is not the function of the court."
*Id.* 544 N.E.2d at 923–24.

In the absence of fraud or mistake, the hospitals' unexpressed intention cannot be implied in the contract. The language of the written contract which was signed by the parties is clear and does not forbid Blue Cross from issuing service contracts to groups of subscribers who compensate Blue Cross in a different manner than by payment of premiums. Blue Cross' issuance of nontraditional service contracts is therefore not a breach of the agreement with the hospitals.

*Id.* at 924.

■ Thus, according to *Latina* and *Aultman*, contract terms are to be given their plain, ordinary meaning unless: (1) expert testimony provides a different meaning, *particular to the industry involved;* (2) some other meaning is clearly evident from the face or overall content of the instrument; or (3) manifest absurdity would result.

■ The plain, ordinary meaning of the express language of the January 24, 1984, letter imposed two obligations on Howard Johnson. First, Howard Johnson was to put CIS on its bidders' list. CIS was put on the bidders' list. While CIS disputes that it was given all the rights which it contends should have flowed from being put on the list, these alleged rights are not spelled out in the agreement. Nor was there any expert testimony to the effect that the refurbishment construction industry has a particular meaning for the phrase "put on the bidders' list." On the contrary, the testimony offered and admitted on this point concerned CIS's expectations and intentions. Under Ohio law, however, intentions not expressed in an unambiguous agreement are presumed to have no existence, and may not be shown by parol evidence. *Aultman,* 544 N.E.2d at 923.

■ The second obligation imposed on Howard Johnson by the express language of the January 24, 1984, letter was to either award $300,000 worth of work to CIS in the first year of the agreement or to negotiate with it in good faith so that it would thereafter receive, together with any work performed in the first year, a total of $300,000 worth of work. CIS contends that the $300,000 figure constitutes a guaranteed minimum only. The agreement does not say this, however. The agreement's plain, ordinary language simply gives CIS the right to a total of $300,000 worth of work. No other meaning is clearly evident from the face or overall content of the agreement. No expert testimony was proffered to show that a specific sum recited in an agreement such as this should not be construed to mean the total sum agreed on by the parties, but merely a minimum from which further obligations would flow. While CIS might have had a subjective expectation that $300,000 was the minimum of work that it would receive, its expectation does not define the obligation of Howard Johnson.

The right to be put on the bidders' list and to receive a total of $300,000 worth of work is all to which CIS was and is entitled unless it is clear that manifest absurdity would result from giving the contract language its plain, ordinary meaning. This is not the case, however. The record here demonstrates that the parties wished to resolve a prior dispute, during the course of which CIS was removed from the bidders' list and lost all opportunity to work with Howard Johnson. In exchange for giving up whatever claims they had against each other, the parties agreed to work together to allow CIS to receive $300,000 worth of work from Howard Johnson, and to be put on the bidders' list. The question whether this consideration is adequate to compensate CIS for whatever it gave up by entering into the settlement agreement is not before us. It cannot be disputed that CIS received consideration of value in the form of being put on the bidders' list and being guaranteed $300,000 worth of work.[3]

3. Under Ohio law, courts will not inquire into the adequacy of consideration once consideration is shown to exist. *Rogers v. Runfola & Assoc.,* 57 Ohio St.3d 5, 565 N.E.2d 540, 542 (1991); *Irving Leasing Corp. v. M & H Tire Co.,* 16 Ohio App.3d 191, 475 N.E.2d 127, 129–30 (1984).

In sum, the phrase "put on the bidders' list" and the agreement's reference to $300,000 worth of work are not qualitatively different than the language at issue in *Latina* ("first right to purchase or refuse to purchase"), or *Aultman* ("service contract"). Such terminology must be given its plain, ordinary meaning, and no other meaning is evident from the agreement itself or from usage particular to the construction industry. Enforcing the agreement according to the plain, ordinary meaning of its terms does not result in manifest absurdity. The agreement is not ambiguous as a matter of law.[4]

■ We must determine, however, whether defendant fully performed its obligations under the agreement, or, conversely, whether CIS has a claim for damages for some legitimate contractual obligation which was not met.

The settlement agreement provided that if CIS did not receive $300,000 worth of work in the first year of the agreement, Howard Johnson would negotiate with it in good faith for the performance of work by CIS which, together with any work performed by it in the first year, would total $300,000. CIS was not given an opportunity to bid on Howard Johnson's 1984 refurbishment projects. Howard Johnson still had the opportunity, within the letter and spirit of the settlement agreement, to negotiate with CIS for the total $300,000 worth of work it had promised. Moreover, at this point, CIS suggested that the agreement be

extended into the next year and Howard Johnson agreed.

In 1985, the extended year of the agreement, CIS was again not invited to bid. However, this fact does not establish a breach of the agreement. Rather, consistent with the agreement's terms, Howard Johnson was contractually obligated to negotiate with CIS in good faith for the performance by CIS of $300,000 worth of work. By the time this obligation came into effect, Howard Johnson's stock had been acquired by Marriott Corporation, and its motor lodges acquired by HJC. CIS had previously stated its concern that the settlement agreement transfer "and be recognized by any new ownership...." (Penker's letter of June 11, 1985.) HJC assumed Howard Johnson's contractual obligations to CIS, and, in its first year of operation, awarded $485,000 worth of work to CIS.

The settlement agreement, as extended by the parties, gave CIS the right to be put on the bidders' list and the right to receive a total of $300,000 worth of work between 1985 and some unspecified amount of time thereafter. CIS was put on the bidders' list, and this list was given by Howard Johnson to HJC. In its first year, HJC awarded over $495,000 worth of work to CIS. The settlement agreement was fully performed as a matter of law, and CIS received everything to which it was entitled.

While it is necessary that the consideration of a promise should be of some value, it is sufficient if it be such as *could* be valuable to the party promising; and the law will not enter into an inquiry as to the adequacy of the consideration, but will leave parties to be the sole judges of the benefits to be derived from their contracts, unless the inadequacy of consideration is so gross as of itself to prove fraud or imposition.
*Columbus Medical Equip. Co. v. Watters,* 13 Ohio App.3d 149, 468 N.E.2d 343, 346 (1983) (quoting *Judy v. Louderman,* 48 Ohio St. 562, 29 N.E. 181 (1891) (syllabus ¶ 2) (emphasis in original)).

4. Since we find that the settlement agreement was not ambiguous, it follows that evidence relating to CIS's understandings and intentions, not expressed in the agreement, should not have been admitted. Parol evidence cannot add

terms to a fully integrated, unambiguous agreement; nor can it contradict an agreement's existing, unambiguous terms. *Latina,* 567 N.E.2d at 264; *Aultman,* 544 N.E.2d at 923. Evidence adduced by CIS to the effect that it had the right to bid on all of Howard Johnson's refurbishment projects indisputably added an obligation to those expressly assumed by Howard Johnson. Evidence adduced by CIS to the effect that $300,000 was not the sum agreed to by the parties, but merely a minimum figure from which further obligations would flow indisputably contradicts the plain language of the agreement. In sum, the construction of the agreement which CIS urges this court to adopt is not a construction at all, but a request that the court remake the agreement. It is clearly not the function of the court to do so. *Id.* at 923–24.

This conclusion makes it unnecessary to address the remaining issues raised by Marriott and CIS's cross-appeal. For the reasons stated, the judgment of the district court is REVERSED, and judgment is hereby ordered to be entered in favor of defendant Marriott Family Restaurants, Inc.[5]

NATHANIEL R. JONES, Circuit Judge, dissenting.

Contrary to the majority opinion, I find the disputed language in the contract ambiguous. Furthermore, I find that CIS was entitled to damages in addition to any work awarded to it by HJC. Therefore, I respectfully dissent.

Under Ohio law, an "[a]mbiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." *Potti v. Duramed Pharmaceuticals, Inc.*, 938 F.2d 641, 647 (6th Cir.1991). Furthermore, as the majority indicates by citing *Latina v. Woodpath Dev. Co.*, 57 Ohio St.3d 212, 567 N.E.2d 262, 263–65 (1991) and *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 544 N.E.2d 920, 922–24 (1989), contract terms are to be given their ordinary meaning unless some other meaning is clearly evident from the face or overall content of the instrument or manifest absurdity would result.

Turning to this case, the pertinent contract language reads as follows:

We [i.e., Howard Johnson] agree immediately to put you [i.e., CIS] on the bidders' list for construction and rehab work. If after one year from this date you have not been the successful bidder on $300,000 worth of work, we agree to negotiate with you in good faith, subject to prevailing rates and quotes, for the performance by you of work which, together with the amount of work you may have been awarded during the prior year, would equal the sum of $300,000.

J.A. at 417. The majority holds that this language entitled CIS to be placed on a list with no guarantee that it would ever get invited to bid on a project. As Marriott— the successor to Howard Johnson and Defendant in this case—notes, Howard Johnson's policy was that not every contractor on the bidders' list was solicited for bids on every project. Therefore, there were, at least conceptually speaking, two lists—we may call them the "master" and "subset" bidders' lists. The master bidders' list was essentially a list of *all* the companies that Howard Johnson would possibly deal with on construction and "rehab" work. The subset bidders' list was a list of the contractors who *actually* get solicited to bid on a particular project. With Howard Johnson's policy in mind, the contract could mean that CIS gets put on the master bidders' list with no guarantee that it would ever get solicited to actually bid on a project. If the first sentence of the paragraph is read in isolation, this seems to be a plausible interpretation. Presumably, a party could give valuable consideration for the right to be on the master list. The majority seems to reach this conclusion by reading this first sentence as though it is

---

**5.** Our conclusion that judgment must be entered in defendant's favor is based upon our holdings that the settlement agreement is not ambiguous as a matter of law, and was fully satisfied as a matter of law. Our conclusion does not require analysis of whether the evidence adduced by CIS was sufficient to support its theory of liability because we find that the theory of liability is without legal merit. Consequently, there are no fact issues to remand for a new trial. This court's recent decision in *Douglass v. Eaton Corp.*, 956 F.2d 1339 (6th Cir.1992), does not require a different result. *Douglass* held that a court may not ignore improperly admitted evidence in ruling on a motion·for j.n.o.v. based upon insufficiency of the evidence. *Id.* at 1343–

44. "If plaintiff had been forewarned during the trial that such [evidence] was not admissible it conceivably could have supplied further foundation or even totally diferent evidence." *Id.* at 1344 (quoting *Midcontinent Broadcasting Co. v. North Central Airlines*, 471 F.2d 357, 359 (8th Cir.1973)). The question here is not the sufficiency of the evidence in support of an otherwise valid legal theory, but the viability of the legal theory itself. Where the theory of liability lacks legal merit, it is proper to enter judgment notwithstanding the verdict. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489–90, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977).

unconnected from the rest of the paragraph.

The first sentence cannot be read in isolation, however. Reading the first sentence in conjunction with the rest of the paragraph leaves the indelible impression that CIS did not give valuable consideration just to be put on the master list. The language, "[i]f ... you *have not been the successful bidder* on $300,000 worth of work," implies that CIS was to be given the opportunity to be a bidder on one or more projects worth $300,000. There was no way CIS could be an unsuccessful bidder without, in the first instance, being a bidder.

Based on the foregoing, CIS and Howard Johnson must have intended the contract to mean that CIS would actually get invited to bid on at least one project. Unlike the majority, I find this interpretation to be the ordinary meaning of the contract terms. Because I have indicated what I deem to be a reasonable interpretation of the contract, and because the majority has indicated what it holds to be a reasonable interpretation of the contract, I would hold that the contract is ambiguous as a matter of law.

There is a further ambiguity in the contract. What did the parties intend by the phrase, "put you on the bidders' list"? Two interpretations of "put you on the bidders' list" are suggested. First, the phrase could mean that CIS gets put on a list and by virtue of getting on this list, it gets to bid on all construction or "rehab" projects for which Howard Johnson solicits bids. This interpretation assumes that there is, at least conceptually, only one list that combines both the master and subset bidders' lists. Second, the phrase could mean that CIS gets put on a list and gets to bid on projects that Howard Johnson independently decides to allow CIS to bid on. This interpretation assumes that there are really two separate lists, namely a master bidders' and a subset bidder's list.

The contract fails to further define "put you on the bidders' list." As a result, either of these two interpretations is reasonable. Therefore, I find that this phrase is ambiguous as a matter of law.[1,2]

Because the jury found that "bidders' list" meant that CIS was supposed to be allowed to bid on every construction and "rehab" project for which Marriott solicited bids, and because CIS was not allowed to bid on every project, the question then becomes, what are the appropriate damages?

The majority argues that the fact that CIS was not invited to bid in 1984 and 1985 (pursuant to a contract extension) does not establish a breach of the agreement. The majority contends that consistent with the agreement's terms, Howard Johnson was contractually obligated to negotiate with CIS in good faith for the performance by CIS of $300,000 worth of work when CIS did not get at least $300,000 worth of work. The majority further contends that HJC, as the successor to Howard Johnson's contractual obligations to CIS, could satisfy the $300,000 minimum amount of work as was required under the contract. It is also asserted by the majority that any damages CIS could have received were satisfied by HJC's award of over $400,000 worth of work to CIS in 1986.

This reasoning directly follows the majority's conclusion that the language of the contract is unambiguous. Because I find that language ambiguous, I fundamentally differ on the analytical approach taken on the relationship between Howard Johnson and CIS and how to interpret HJC's awarding of over $400,000 worth of work to CIS in 1986.

Because the jury found the ambiguous language to mean that CIS was to have the opportunity to bid on each project, it is my view that the contract must be analyzed with that understanding. With the jury's verdict in mind, I read Howard Johnson's obligation to negotiate with CIS in good

---

1. Because I think the paragraph is ambiguous, I would hold that the district court correctly admitted parol evidence. Rather than remaking the agreement (as the majority contends CIS is requesting), allowing parol evidence in this case helped define an otherwise undefined phrase, "bidders' list."

2. I would also find that the jury instructions on ambiguity and parol evidence were proper.

faith for the performance by CIS of $300,-000 worth of work to mean that Howard Johnson was to negotiate with CIS if: 1) CIS was invited to bid on each project; and 2) after bidding on each project, CIS did not receive $300,000 worth of work. It seems to me that if Howard Johnson breaches one of the fundamental conditions of the contract, it does not matter whether Howard Johnson negotiates further with CIS. Because Howard Johnson did not allow CIS to bid on each project in 1984 and 1985, I would hold that Howard Johnson breached a fundamental condition of the contract.

By virtue of the breach, CIS is therefore entitled to damages from Howard Johnson for the years 1984 and 1985. I would find that the jury damage award given for the years 1984 and 1985 to be appropriate.[3, 4]

For the reasons stated herein, I would affirm.

---

3. CIS's theory of damages was based on the following formula: 1) the number of rooms refurbished from 1984 and 1985 was multiplied by the average contract price; 2) the resulting dollar figure was multiplied by the percentage of rooms on which CIS expected to be the successful bidder; and 3) the resulting dollar amount was multiplied by CIS's percentage of profit to arrive at a final damage figure. I find CIS's theory of damages appropriate.

4. HJC's award of over $400,000 worth of work to CIS in 1986 is separate from the damages CIS incurred because it was not invited to bid on every project in 1984 and 1985.