Thomas M. KLEPSKY,
Plaintiff–Appellee,

v.

DICK ENTERPRISES, INC.,
Defendant–Appellant.

No. 01–3486.

United States Court of Appeals,
Sixth Circuit.

Jan. 9, 2003.

Before BOGGS and COLE, Circuit Judges; and BELL, District Judge.[*]

BELL, District Judge.

This action involves an intentional tort claim brought by an employee against his employer. Defendant Dick Enterprises, Inc. appeals the district court's denial of its motion for judgment as a matter of law or, in the alternative, for a new trial. For the reasons that follow, we affirm the judgment entered in the district court.

I.

Plaintiff Thomas M. Klepsky suffered an on-the-job injury while he was employed as a carpenter by defendant Dick Enterprises. Klepsky filed suit against his employer in Ohio state court alleging that Dick Enterprises was liable for intentionally causing his injuries. Klepsky sought both compensatory and punitive damages. Dick Enterprises properly removed the case to federal court on the basis of diversity jurisdiction.

At trial, the parties stipulated to many of the relevant background facts. Dick Enterprises is a Pennsylvania construction contractor whose business includes bridge construction. In September 1995, Dick Enterprises was performing renovation work on the Veterans Memorial Bridge in Cleveland, Ohio. The repairs included replacing and repouring concrete on the bridge. On September 5, 1995, Klepsky and two co-workers, Christopher Mohrman and Victor Burda, were removing metal deck pans from bays underneath the bridge.

Metal deck pans are used in bridge construction to help form and set in place newly poured concrete. The pans measure approximately 8 feet by 3 feet in size and weigh 20 to 25 pounds. The pans are attached to the bridge by wooden planks which, in turn, are supported by metal brackets anchored to the bay itself. The concrete is then poured between the bridge and the pan. Once the concrete is set, the pans are removed. There is no standard way to remove metal deck pans. The carpenters on the Veterans Memorial Bridge project would work from a motorized manlift or scissor lift which would elevate them 20 to 25 feet from the ground to where they could reach the pans. While standing on the work platform of the manlift, the carpenters would remove alternating steel support brackets which were anchored into the side walls. The carpenters would then remove the wood which supported the pans. When a pan came loose, it would be lifted down onto the manlift or would drop onto the manlift of its own accord. If a pan was stuck, which is not unusual for an end pan, the carpenters would loosen it from the concrete using a

[*] The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

crowbar or a chipping hammer. A chipping hammer is an electric or pneumatic hammer.

On September 5, 1995, after removing all of the support brackets from the last pan in the bay, Klepsky and Mohrman found the pan firmly adhering to the concrete. They sent Burda to find the chipping hammer. Desi Trabucco, Dick Enterprises' construction supervisor on the project, came by and asked Klepsky and Mohrman why they were not working. Trabucco, Mohrman, and Klepsky then engaged in a conversation as to how the pan might be removed without a chipping hammer. The content of that conversation was the subject of conflicting testimony at trial.

Klepsky testified that Mohrman suggested attaching a steel choker to the manlift and then using the downward mechanical power of the manlift to pull the pan off. Klepsky testified that he objected, telling Trabucco and Mohrman it was not a good idea because "[i]f the pan takes off, it will take one of our frigging heads off. It could kill one of us." "[W]e got nowhere to go up there." According to Klepsky. Trabucco responded, "Just do it. Give it a try. Just do it." When Klepsky and Mohrman attempted to attach the steel choker, they found that it was not long enough to attach to the manlift. Klepsky testified that Trabucco then handed them a 20-foot nylon strap and told them to attach it to the manlift to pull the pan down.

Dick Enterprises presented conflicting testimony from Trabucco and Mohrman. Trabucco did not deny handing the men the nylon strap, but he testified that he did not tell them to tie it to the manlift. He testified that he told them instead to tie it to a come-along or ratchet-type device to pull the pan down, although he did not provide them with such a device. Neither Mohrman nor Trabucco recalled Klepsky voicing any objection to using the manlift procedure. In contradiction to the testimony of both Trabucco and Klepsky, Mohrman testified that using the manlift to pull the pan off was Trabucco's idea, not his own.

After handing the men the nylon strap, Trabucco left the area. Klepsky and Mohrman wrapped one end of the 20-foot nylon strap around the manlift and attached the other end to the deck pan. They proceeded to lower the lift to exert downward pressure on the deck pan. When they did this, the wheels of the lift were raised off the ground by the force of the tension. They then raised the lift until the wheels returned to the ground, but there was still tension on the strap. Klepsky hit the end of the pan with a sledgehammer. After Klepsky delivered several blows. Mohrman warned him that the pan was coming loose. Klepsky dropped the sledgehammer and stepped aside. The pan came down, hit Klepsky's hand, and flew past him until it crashed into the far side of the bridge some forty-five feet away.

The pan nearly severed Klepsky's left hand below the finger joints. Surgery was performed to reattach his fingers. As a result of the injury, Klepsky lost the fine motor function in his left hand and was unable to resume his work as a journeyman carpenter. He found alternative work at a lower wage as a United Parcel Service ("UPS") truck driver.

Dick Enterprises moved for judgment as a matter of law at the close of Klepsky's case and again at the close of all of the evidence, based upon its contention that the evidence was insufficient to demonstrate that Dick Enterprises had knowledge that injury to Klepsky was "substantially certain" to occur. The district court denied both motions.

On February 1, 2001, the jury returned a verdict awarding Klepsky $150,000 in compensatory damages. The jury denied Klepsky's request for punitive damages. Dick Enterprises filed a renewed motion for judgment as a matter of law or in the alternative for a new trial. The motion was denied by the district court. Dick Enterprises timely filed this appeal.

## II.

Dick Enterprises' primary argument on appeal is that the district court erred in denying its motion for judgment as a matter of law. We review the denial of a motion for judgment as a matter of law *de novo*. *McCurdy v. Montgomery County*, 240 F.3d 512, 516–17 (6th Cir.2001) (citing *Cook v. Am. S.S. Co.*, 53 F.3d 733, 740 (6th Cir.1995)).

In diversity cases, when a Rule 50(b) motion for judgment as a matter of law is based on a challenge to the sufficiency of the evidence, this court applies the standard of review used by the courts of the state whose substantive law governs the action. *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir.1998); *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir.1996). This diversity case is governed by Ohio substantive law. Under Ohio law, "[t]he test for granting a directed verdict or a judgment n.o.v. is whether the movant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the nonmovant." *Sanek v. Duracote Corp.*, 43 Ohio St.3d 169, 539 N.E.2d 1114, 1117 (Ohio 1989).

> Ohio courts require that a court presented with a motion for a directed verdict construe the evidence and all permissible inferences therefrom most strongly in favor of the party against whom the motion is made and consider neither the weight of the evidence nor the credibili-

ty of the witnesses in disposing of the motion. Such a motion will be granted only if, after considering the evidence in this light, there can be but one reasonable conclusion as to the proper verdict.

*Constr. Interior Sys. Inc. v. Marriott Family Rest., Inc.*, 984 F.2d 749, 753 (6th Cir.1993) (quoting *Potti v. Duramed Pharm.*, 938 F.2d 641, 645 (6th Cir.1991) (citations omitted)).

In most circumstances, an employee injured in the course of employment is limited to redress through the Ohio Workers' Compensation Act, OHIO REV.CODE § 4123.01 *et seq.*, OHIO CONST. art. II. § 35. Ohio common law recognizes a limited exception for intentional torts. *Johnson v. BP Chem., Inc.*, 85 Ohio St.3d 298, 707 N.E.2d 1107, 1114 (Ohio 1999); *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 112–13, 522 N.E.2d 489, 500–01 (Ohio 1988).

In order to present a triable issue of fact on the requisite "intent" for an intentional tort claim against an employer, the plaintiff must present facts demonstrating:

> (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

*Fyffe v. Jeno's, Inc.*, 59 Ohio St.3d 115, 570 N.E.2d 1108, 1112 (Ohio 1991), syllabus ¶ 1, modifying *Van Fossen*, 522 N.E.2d at 491, syllabus ¶ 5. In other words, the plaintiff must show more than negligence or recklessness, and the plaintiff must show

more than a high risk of injury. *Jandro v. Ohio Edison Co.*, 167 F.3d 309, 313 (6th Cir.1999). The plaintiff must show that the employer "(1) specifically desired to injure the employee; or (2) knew that injury to an employee was certain or substantially certain to result from the employer's act and, despite this knowledge, still proceeded." *Id.* (quoting *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 532 N.E.2d 753, 756 (Ohio 1988)).

While Ohio law does not offer a bright line between recklessness and intentional torts, it does teach that the critical inquiry in an intentional tort case is the likelihood that injury will occur. *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1016 (6th Cir.1993). The inquiry is described in terms of a continuum of probability of risk:

> Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of the risk—something short of substantial certainty—is not intent.

*Fyffe*, 570 N.E.2d at 1110, syllabus ¶ 2, modifying *Van Fossen*, 522 N.E.2d at 491–92, syllabus ¶ 6. The *Fyffe* court noted that the same acts which could correctly be viewed as acts of recklessness in most instances, could, in a given instance, and within a certain fact pattern, equate to one that is substantially certain to result in harm to the employee and reasonably raise a justiciable issue of an intentional tort.

*Id.* at 1111–12. Cases involving workplace intentional torts must accordingly be judged on the totality of the circumstances surrounding each incident. *Gibson v. Drainage Prods., Inc.*, 95 Ohio St.3d 171, 178, 766 N.E.2d 982, 989 (Ohio 2002). Because the determination of employer intent is so fact specific, the standard for establishing an intentional tort "emerges not so much from the words used to formulate the test as it does from the decisions rendered in response to specific fact situations. Such is the nature of the common law." *Kunkler v. Goodyear Tire & Rubber Co.* 36 Ohio St.3d 135, 139, 522 N.E.2d 477, 481 (Ohio 1988).

#### a. Knowledge of dangerous procedure

■ The first prong of the *Fyffe* test requires Klepsky to show that Trabucco knew that the strap manlift procedure was dangerous. In the context of intentional tort claims, "dangerous" means presenting dangers that fall "outside the natural hazards of [his] employment." *Youngbird v. Whirlpool Corp.*, 99 Ohio App.3d 740, 747, 651 N.E.2d 1314, 1318 (Ohio Ct.App.1994).

Because we must construe the evidence most strongly in favor of Klepsky, for purposes of this motion we must assume that Klepsky advised Trabucco that he objected to the strap/ manlift procedure due to the dangers it posed and that Trabucco nevertheless required Klepsky to perform that procedure. Klepsky's job of removing pans from beneath the bridge was inherently dangerous. The deck pans were removed while the carpenters were standing in the elevated manlift. When the pans were loosened, they would often drop onto the rails or the floor of the manlift where the carpenters were standing. There was little room for the carpenters to move out of the way of a falling pan.

Klepsky presented evidence that the strap/manlift procedure increased the dan-

gers to the carpenters because the tension of the strap on the pan would result in the pan coming down at a greater velocity than normal. Klepsky also presented evidence that Trabucco knew that the manlift was not supposed to be used to pull pans down. Viewing the facts in the light most favorable to Klepsky, a jury could find that Trabucco knew a manlift should not be used in the manner he suggested, and Trabucco was informed that the procedure was dangerous. The court is satisfied that the evidence presented a jury question as to whether the tension on the pan posed a risk to the carpenters that was outside the natural hazards of their employment.

### b. Substantially certain

The second prong of the *Fyffe* test requires evidence that the employer knew that if the procedure was used, injury was substantially certain to occur. Dick Enterprises contends that there is no evidence that it had knowledge that the strap/manlift procedure was substantially certain to cause injury or harm. In support of this contention, Dick Enterprises notes the lack of any previous accidents from using the strap/manlift procedure.

"Establishing the employer's knowledge of substantial certainty of harm is difficult where there are no prior accidents of a similar character, but a lack of prior accidents is not necessarily fatal to a plaintiff's case." *Taulbee v. Adience, Inc., BMI Div.,* 120 Ohio App.3d 11, 20, 696 N.E.2d 625, 631 (Ohio Ct.App.1997). Substantial certainty of harm can be shown even in the absence of a previous accident. For example, in *Fyffe* an employee was injured as he attempted to clean a conveyor belt while it was running. Evidence was presented that the employer had removed the Plexiglas guard on the machine and that the plaintiff employee had been instructed by his supervisor to clean the conveyor belt with the belt running. Although there was no indication that there had been previous accidents on the conveyor belt, the Ohio Supreme Court held that the evidence presented was sufficient to create a jury question on the employee's intentional tort claim. 570 N.E.2d at 1113–14. In *Taulbee* the court allowed an intentional tort claim to go to the jury in the absence of a previous injury because the court found that unsafe scaffolding together with a history of lighting failures created "such an obvious hazard" that the employer knew that an injury was substantially certain to occur. 696 N.E.2d at 632. In *Cook v. Cleveland Elec. Illuminating Co.,* 102 Ohio App.3d 417, 429–30, 657 N.E.2d 356, 364 (Ohio Ct.App.1995), the court similarly allowed the intentional tort claim to go to the jury in the absence of previous accidents relating to the power transfer system:

> The appreciation of danger can be obtained in a myriad of ways other than personal knowledge or previous injuries. Simply because people are not injured, maimed or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. If we were to accept the appellee's reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed. This is not the purpose of *Fyffe*. It is not incumbent that a person be burned before one knows not to play with fire.

*Id.* "Proof that the employer knew to a substantial certainty that harm to the employee would result often must be demonstrated through circumstantial evidence and inferences drawn from the evidence." *Estep v. Rieter Auto. N. Am.,* 148 Ohio

App.3d 546, 551, 774 N.E.2d 323, 326–27 (Ohio Ct.App.2002).

Dick Enterprises challenges the district court's determination that the jury could reasonably find Trabucco had knowledge that injury was "substantially certain" to occur based on "common sense" and on Klepsky's statement to Trabucco that "if the pan flew off the bridge, it could kill one of them." According to Dick Enterprises, the likelihood of an injury was not a matter of common sense as evidenced by Klepsky's failure to bring his safety concerns to his shop steward, Klepsky's co-worker's failure to object to the procedure, Trabucco's lack of experience in removing pans from bridges, Klepsky's own testimony that Trabucco had "no idea what was going to happen," and the conditional nature of Klepsky's danger warning ("if" the pan takes off, it "could" kill someone). Based upon this evidence, Dick Enterprises argues that no jury could reasonably find that the dangers of the procedure were so obvious or egregious to those in the industry that it reasonably could be said Trabucco knew Klepsky's injury was substantially certain.

Dick Enterprises also contends this case lacks the level of employer knowledge found sufficient to support claims in other cases, and that it is more analogous to those cases where the evidence was found insufficient as a matter of law to support intentional tort claims against the employer. For example, in *Sanek v. Duracote Corp.*, 43 Ohio St.3d 169, 539 N.E.2d 1114 (Ohio 1989), the employee was injured when he hit the rotating shaft of an unguarded mixer with his hand. The Ohio Supreme Court held that the facts were not sufficient to submit an intentional tort claim against an employer to the jury where the evidence revealed that the mixers had been in use for years, the mixers were normally turned off before address-

ing problems, no previous accidents had occurred on the mixers, and no one instructed or directed the employee to hit the rotating shaft. 539 N.E.2d at 1115. Under these facts the Ohio Supreme Court found that the employer could not be expected to have anticipated the action of the employee which led to his injury and accordingly reversed the court of appeals decision which had affirmed the jury verdict in favor of the injured employee. *Id.* at 1117.

In *Pariseau v. Wedge Prods. Inc.*, 36 Ohio St.3d 124, 522 N.E.2d 511 (Ohio 1988), the plaintiff was injured when the restraint guards on the punch press he was operating failed. The plaintiff presented evidence that the pullback restraint guards had not been adjusted properly. The plaintiff also presented evidence that the employer was aware that the brakes had previously malfunctioned, that the press had repeated, and that the press had been involved in a prior accident. The Supreme Court agreed with the trial court that these various acts of negligence failed to constitute an "intentional tort" because the evidence did not support a finding that the employer knew that an injury was substantially certain to occur. 522 N.E.2d at 516. *See also Cummins v. JGB Indus., Inc.*, No. 99–3462, 2001 WL 128336 at *4–*5 (6th Cir. Feb.7, 2001) (per curiam) (unpublished) (holding that where plaintiff's decedent fell from bucket truck when compensating chain broke, case should not have been submitted to the jury because employer's failure to abide by manufacturer's recommended maintenance schedule was insufficient to show that employer knew with substantial certainty that accident would occur).

These cases cited by Dick Enterprises involve omissions by the employer that could be construed as a negligent or even reckless failure to protect. Because they

involved conditions that had been in place for a long time and because they had not resulted in prior injuries, the employers could not be said to have known the risk of injury with substantial certainty.

This case, by contrast, does not involve negligent omissions on the part of the employer. Instead, viewing the evidence in the light most favorable to Klepsky, this case involves an affirmative order that the carpenters engage in a novel procedure that was obviously and inherently dangerous.

As previously noted, an employer's level of knowledge is judged on the totality of the circumstances surrounding each incident. *Gibson*, 766 N.E.2d at 989. Moreover, this court must construe not only the evidence but also all permissible inferences therefrom most strongly in favor of the party against whom the motion is made. *Constr. Interior Sys.*, 984 F.2d at 753. Trabucco's knowledge of the probability of the risk of harm in this case is supported by his own testimony that he knew that a manlift should not be used to pull pans down, and by common sense as to how the addition of tension on the pan would affect the speed of the pan as it came down. There was evidence that prior to the accident Trabucco had never removed a pan from a bridge. Although Dick Enterprises cites this evidence to show Trabucco's lack of knowledge of the risk of injury, another permissible inference is that Trabucco's failure to listen to the most senior carpenter's safety concerns regarding the strap manlift procedure was all the more egregious in light of his own inexperience. There was also evidence that there was a commonly used and safer method for removing pans that were stuck, but that Trabucco insisted on an unsafe method merely for the sake of saving the time that would have been involved in obtaining the chipping hammer. A jury could reason-

ably infer that Trabucco's insistence on an unsafe method, where a safe method was available, evidenced a disregard for worker safety. Trabucco testified that he would never have suggested using the strap/manlift procedure because it was unsafe and he testified that Klepsky did not object to the procedure. The jury apparently did not believe his testimony. Their disbelief of Trabucco's testimony supports a reasonable inference that Trabucco was in fact more knowledgeable about the risks of the procedure than he admitted at trial.

While this case undoubtedly presents a close question on the issue of whether the employer knew that injury was a substantial certainty, we are satisfied that when the evidence and all permissible inferences are construed in the light most favorable to Klepsky, there was sufficient evidence of record that would have permitted a reasonable jury to conclude, as this jury did, that Trabucco knew that the strap/manlift procedure was substantially certain to cause injury.

c. Required performance of dangerous duties

The third prong of the *Fyffe* test requires evidence that the employer required the employee to perform the job despite its knowledge of the danger.

> [T]he third element of the *Fyffe* test can be satisfied by presenting evidence that raises an inference that the employer, through its actions and policies, required the employee to engage in that dangerous task.... [A] jury issue arises concerning the third element of the *Fyffe* test when sufficient credible evidence is presented that the employer merely expected the employee to engage in a dangerous task.

*Gibson*, 766 N.E.2d at 989 (internal citation omitted).

There is no question that Klepsky offered evidence that Trabucco required him to remove the pan by using the strap manlift procedure. Dick Enterprises contends, nevertheless, that there was no evidence that such conduct on the part of Dick Enterprises was the proximate cause of Klepsky's injuries. Specifically, Dick Enterprises notes that the evidence revealed that the panel did not come down when the strap alone was used. Rather, the evidence showed that the pan did not come down until Klepsky hit it with the sledgehammer. Dick Enterprises contends that because there is no evidence that Trabucco told Klepsky to use the sledgehammer, the employer cannot be held responsible for requiring Klepsky to perform the dangerous procedure that resulted in his injury.

While there is no evidence that Trabucco told Klepsky to use the sledgehammer, the jury could reasonably find that Trabucco might have expected Klepsky to use the sledgehammer. Klepsky presented evidence that it was common to use a sledgehammer on a stuck pan. There was also testimony that one of Trabucco's first questions to Klepsky before the injury was whether he had tried beating on the pan to get it off. More importantly, there was evidence from which a jury could reasonably find that what caused the injury in this case was not the use of the sledgehammer, or having the pan drop, but having the pan pulled down at an increased velocity by the manlift. Klepsky testified that it was common to allow pans to fall onto the manlift. That was a normal risk of the job. There is also evidence that in this case the pan did not simply drop onto the manlift when it came loose, but flew "like a rocket" to the far side of the bridge some forty-five feet away.

Construing the evidence in the light most favorable to Klepsky, we cannot say that there was insufficient evidence as a matter of law to show an intentional tort. We are satisfied that the evidence was sufficient to create an issue of fact for the jury on Klepsky's intentional tort claim. Accordingly, we affirm the district court's denial of Dick Enterprises's motion for directed verdict.

### III.

Dick Enterprises also contends the district court committed reversible error in its evidentiary rulings. The district court's evidentiary rulings are subject to the abuse of discretion standard of review. *United States v. Haywood,* 280 F.3d 715, 720 (6th Cir.2002). Under this standard, we leave rulings about admissibility of evidence undisturbed unless we are left with the definite and firm conviction that the district court committed a clear error of judgment or where it improperly applied the law or used an erroneous legal standard. *Id.* On review, we must look at the evidence in the light most favorable to its proponent, "maximizing its probative value and minimizing its prejudicial effect." *Sutkiewicz v. Monroe County Sheriff,* 110 F.3d 352, 360 (6th Cir.1997) (quoting *United States v. Zipkin,* 729 F.2d 384, 389–90 (6th Cir.1984)).

■ Dick Enterprises contends the district court abused its discretion in allowing two photographs of plaintiff's injured hand into evidence. Dick Enterprises contends the photographs of the injury were highly prejudicial and irrelevant.

The two photographs at issue which showed the laceration of Klepsky's hand were relevant to the issue of damages and to the manner in which the injury occurred. Relevant evidence "may be excluded if its probative value is *substantially outweighed* by the danger of *unfair prejudice,* confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." FED. R. CIV. P. 403 (emphasis added). The probative value of the photographs at issue was not substantially outweighed by the danger of any unfair prejudice. Accordingly, we find that the trial court did not abuse its discretion in admitting the photographs.

■ Dick Enterprises also contends the district court erred in allowing into evidence testimony of Klepsky's treating physician, Dr. Roderick B. Jordan, that the September 5, 1995 injury was a proximate cause of the carpal tunnel syndrome of Klepsky's left hand. Dick Enterprises notes that Dr. Jordan indicated that Klepsky has bilateral carpal tunnel syndrome equally affecting both the right and the left hand, and he admitted that Klepsky's current employment as a UPS truck driver could be a contributing cause of Klepsky's carpal tunnel syndrome.

Although Dr. Jordan testified that Klepsky's current employment might be a contributing factor to his carpal tunnel syndrome, he did not waver from his opinion that the 1995 injury was also a contributing cause, in fact the biggest risk factor, in his developing carpal tunnel syndrome of his left hand. Dr. Jordan's opinion was not based upon speculation or possibilities, but on his professional judgment to a reasonable degree of medical certainty. Because there can be more than one contributing cause to an injury, the court did not abuse its discretion in admitting his testimony.

### IV.

For all the reasons stated herein we AFFIRM the trial court's entry of judgment in favor of plaintiff Thomas M. Klepsky.