**BRANTLEY VENTURE PARTNERS II, L.P., Plaintiff,**

v.

**DAUPHIN DEPOSIT BANK AND TRUST COMPANY, Defendant.**

No. 97–CV–1049.

United States District Court, N.D. Ohio, Eastern Division.

May 28, 1998.

Frances Floriano Goins, Steven A. Friedman, Squire, Sanders & Dempsey, Cleveland, OH, for Brantley Venture Partners II, L.P., plaintiff.

William Mowry Connelly, Walter & Haverfield Cleveland, OH, for Dauphin Deposit Bank and Trust Company, defendant.

## ORDER

GWIN, District Judge.

On July 14, 1997, Defendants Dauphin Deposit Bank and Trust Company filed a motion for summary judgment [Doc. 18]. On April 27, 1998, Plaintiff Brantley Venture Partners II, L.P. filed a motion for partial summary judgment [Doc. 51]. In this action, Plaintiff Brantley Partners sues Defendant Dauphin Bank to avoid a suretyship agreement ("Agreement") it executed in favor of Defendant Dauphin Bank on April 30, 1996. First, Plaintiff Brantley Partners seeks declaratory judgment that the surety agree-

ment did not become effective until the closing of a corporate acquisition (Count I). Second, Brantley Partners says Defendant Dauphin Bank broke fiduciary duties in executing an alleged oral escrow agreement (Count II). Third, Brantley Partners avers that its general partner did not have authority to execute the surety agreement and the Agreement is ultra vires (Count III). Finally, Plaintiff Brantley Partners says the Agreement was fraudulently induced. In its motion, Defendant Dauphin Bank seeks judgment on all four of Plaintiff Brantley Partners's claims.

Defendant Dauphin Bank answers and asserts three counterclaims against Brantley: Counterclaim I seeks a declaratory judgment enforcing the validity of the Agreement; Counterclaim II seeks the amount allegedly due under the Agreement; Counterclaim III seeks attorney fees and expenses for defending this action. In response, Plaintiff Brantley seeks judgment on all three of Dauphin Bank's counterclaims.

In ruling on the instant motions for summary judgment, the Court decides whether the surety agreement was in effect before or after the settlement of a pending merger between two companies. In doing so, we first decide whether the surety agreement fully reflects the intention of the parties. If so, then the Court decides if material issues exists on whether the Agreement was conditioned on or to be held in escrow until the closing of a certain financial transaction. To do this, the Court must decide, under these facts, whether the parol evidence rule bars consideration of extrinsic evidence when interpreting the terms of the Agreement. The Court also decides whether consideration supports the surety agreement and whether Dauphin Bank's claim of promissory estoppel bars Plaintiff Brantley Partners's claims.

For the reasons that follow, Defendant Dauphin Bank's motion for summary judgment is denied as to Plaintiff Brantley Partners's claims for declaratory judgment on the invalidity of the surety agreement (Count I) and for breach of fiduciary duty (Count II). The Court grants Defendant Dauphin Bank's motion on Brantley Partners's claims of *ultra vires* (Count III) and for fraudulent induce-

ment (Count IV). Plaintiff Brantley Partners's motion for partial summary judgment on Dauphin Bank's counterclaim seeking to enforce the suretyship agreement is denied.

### I

Pursuant to Federal Rule of Civil Procedure 56, summary judgment shall be rendered when requested if the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In assessing the merits of the motion, this court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the non-moving party. *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 414, 139 L.Ed.2d 317 (1997). However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, (6th Cir. April 2, 1998).

### II

This cases involves a surety agreement between Plaintiff Brantley Partners and Defendant Dauphin Bank. The surety agreement was created as part of a financing strategy needed to consummate the corporate merger of two companies, the Transmodal Corporation and a company called Goodway Transport, Inc. ("Goodway"). Brantley Partners is a limited partnership in the venture capital business. The partnership's primary focus is to help create or expand business enterprises. Typically, Brantley Partners invests time and funds into the development of companies in exchange for an equity interest in the enterprise. Plaintiff

Brantley Partners is a shareholder of the Transmodal Corporation.

In early 1996, the Transmodal Company sought to acquire Goodway. At the time, Goodway was a credit customer of Defendant Dauphin Bank. To obtain Defendant Dauphin Bank's approval of the merger, Goodway needed to reduce its existing debt with Dauphin Bank. Goodway owed Defendant Dauphin Bank approximately $6.2 million, including $1,728,385.00 in obligations on three letters of credit. Defendant Dauphin Bank held a security interest in Goodway's accounts receivable.

As part of the proposed Transmodal–Goodway merger, Defendant Dauphin Bank agreed to receive a $4.5 million payment on Goodway's behalf·from Allied Carriers Exchange, Inc. ("Allied"), a Colorado-based co-op bank. Allied agreed to provide the funds if Dauphin Bank assigned its security interest in Goodway's accounts receivable to Allied. Near May 1, 1996, Dauphin Bank assigned the receivables to Allied. Allied subsequently paid Dauphin Bank the $4.5 million toward Goodway's debt.

As part of the same merger transaction, Defendant Dauphin Bank also entered a $1.7 million suretyship agreement with Plaintiff Brantley Partners. In it, Brantley Partners would satisfy Goodway's remaining obligations on three letters of credit, should Goodway be unable to pay. The parties entered the surety agreement near April 30, 1996. However, near June 1, 1996, the Transmodal–Goodway acquisition fell through. After that, Goodway filed for bankruptcy. Defendant Dauphin now seeks to enforce the surety agreement with Plaintiff Brantley Partners for payment on Goodway's letters of credit.

Plaintiff Brantley Partners brings this action seeking a declaration that the suretyship agreement favoring Defendant Dauphin Bank is invalid. Brantley Partners contends the validity of the Agreement was contingent on the successful merger of Transmodal and Goodway. Defendant Dauphin Bank disagrees, contending that the plain language of the Agreement did not include contingencies for settling the Transmodal–Goodway transaction.

## III

Defendant Dauphin Bank contends that it is entitled to summary judgment on all four of Plaintiff Brantley Partners claims for the following reasons: (1) Plaintiff Brantley Partners is stopped from avoiding the surety agreement because Dauphin Bank, in reliance on the Agreement, released and waived its rights to a security interest in Goodway's accounts receivable; (2) the Agreement is a fully integrated, unambiguous written contract that cannot be altered under parol evidence rule; (3) Brantley Partners's claim for breach of fiduciary duty fails to state a claim for relief under Ohio law; (4) Brantley Partners's claim under *ultra vires* fails because Brantley Partners's managing general partner, Robert Pinkas, acted with apparent authority when executing the surety agreement; and (5) Brantley Partners's claim for fraudulent inducement fails because Brantley Partners fails to establish that Dauphin Bank, at anytime, had "superior knowledge" of Goodway's poor financial condition, or that Dauphin Bank willfully withheld this information from Brantley Partners. As related, Dauphin Bank says that Brantley Partners fails to states a claim for fraudulent inducement under Ohio law.

## IV

Defendant Dauphin Bank first raises the parol evidence rule as a bar to Plaintiff Brantley Partners contention that the surety agreement was conditioned upon, or to be held in escrow, until *after* the Transmodal–Goodway transaction settled.

■ The parol evidence rule is a substantive rule of law that prohibits parties to a contract from later contradicting the express language of the contract with evidence of other alleged or actual agreements. *American Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 422 (6th Cir.1984); *Ed Schory & Sons, Inc. v. Society Nat'l Bank*, 75 Ohio St.3d 433, 440–41, 662 N.E.2d· 1074 (1996). In Ohio, the law is clear that when a contract is deemed fully integrated, outside expressions may not be used to express alternative meaning or to vary the terms of the contract.

In *Astor v. International Bus. Mach. Corp.,* 7 F.3d 533, 537 (6th Cir.1993), the Sixth Circuit reviewed Ohio law on this issue, stating:

> 'Where the parties, following negotiations, make · mutual promises which thereafter are integrated into an unambiguous written contract, duly signed by them, courts will give effect to the parties' expressed intentions .... Intentions not expressed in the writing are deemed to have no existence and may not be shown by parol evidence.' (citations omitted). 'Even where a contract is not fully integrated, parol evidence cannot be admitted if its effect will be to vary or contradict any matter that is specifically covered by the written terms of the contract.'

*Id.* (citing *Construction Interior Sys., Inc. v. Marriott Family Restaurants, Inc.,* 984 F.2d 749, 754 (6th Cir.), *cert. denied,* 510 U.S. 869, 114 S.Ct. 194, 126 L.Ed.2d 152 (1993) (emphasis omitted)). However, parol evidence may be admitted to "explain certain ambiguous terms not inconsistent with or contradictory to the language of the contract...." *Center Ridge Ganley, Inc. v. Stinn,* 31 Ohio St.3d 310, 312, 511 N.E.2d 106 (1987).

█ As related here, parol evidence may be admissible "as it bears on the threshold question of whether the written instrument is ... an 'integrated' agreement." *CMI–Trading, Inc. v. Quantum Air, Inc.,* 98 F.3d 887, 891 (6th Cir.1996) (citation omitted). A contract is "fully integrated" if the written language, when reviewed within the four corners of the contract, expresses the intentions of the parties. If a party is able to show some evidence that a contract is not a complete integration of the issues covered by the contract, this evidence should be presented to a fact finder to determine whether the contract was intended to be a complete integration of the agreement. *Id.* (citation omitted).

█ Under Ohio law, "contract terms are to be given their plain, ordinary meaning unless: (1) expert testimony provides a different meaning, particular to the industry involved; (2) some other meaning is clearly evident from the face or overall content of the instrument; or (3) manifest absurdity

would result." · *Construction Interior Sys., Inc.,* 984 F.2d at 755. Interpretation of a written contract is a matter of law for initial determination by the court. Only when the "relevant contract language is ambiguous" is the job of interpretation turned over to a fact finder. *Astor,* 7 F.3d at 539–40. See also *Potti v. Duramed Pharmaceuticals, Inc.,* 938 F.2d 641, 647 (6th Cir.1991).

█ In the instant·case, the parties do not dispute the existence of a written suretyship agreement. However, the parties dispute the Agreement's validity. Specifically, the parties dispute what date the agreement became effective. They also dispute whether the agreement was contingent upon the successful settlement of the Transmodal–Goodway merger.

Language contained in the first paragraph of the Agreement shows the contract was "unconditional." The surety agreement states:

> For value received, the Undersigned, jointly and severally, hereby unconditionally agree to make prompt payment of all obligations, indebtedness and liabilities due Dauphin Deposit Bank and Trust Company ... of any kind, whether now existing or hereafter arising, due or which may become due, whether· be acceleration or otherwise, absolute or contingent, joint or several, direct or indirect, secured or unsecured by Goodway Transport, Inc....

The surety agreement is signed and the handwritten date of April 30, 1996, appears on the face of the Agreement.

However, despite this language, other evidence shows that the parties may not have intended the surety agreement to be completely "unconditional." Specifically, there is evidence showing the parties did not agreed that April 30, 1996, would be the definitive effective date for the surety agreement. In a letter dated April 30, 1998, from Eric Rebert, Senior Vice President of Dauphin Bank, to Gailyn Larsen, Chairman of Goodway, Rebert details Dauphin Bank's consent and understanding of the sequence of events related

to the Transmodal–Goodway settlement.[1] This letter suggests Defendant Dauphin Bank may have understood that the validity of the Agreement was contingent on the closing of the merger.

Other evidence shows that Jane Kline, a representative of Dauphin Bank, admits writing "April 30, 1996" on the face of the Agreement when representatives of Plaintiff Brantley Partners were not present. Ms. Kline may have also lacked authority to add the date of April 30, 1996, to the Agreement.[2] The parties also dispute whether Defendant Dauphin Bank agreed to hold the surety agreement in escrow until the Transmodal–Goodway merger settled. The affidavit of Robert Pinkas, general manager of Brantley Partners, shows that Pinkas and Kline had telephone discussions about Dauphin Bank holding the Agreement in escrow. Kline denies making these statements.

Construing the whole of this evidence most favorably to Brantley Partners, the Court finds that a reasonable jury could conclude the surety agreement was not effective until after the Transmodal–Goodway transaction settled. Because genuine issues of material fact exists regarding when the Agreement took effect, and because the parties dispute the extent of Ms. Kline's authority to date the Agreement, summary judgment is inappropriate. Accordingly, the Court denies Defendant Dauphin Bank's motion for judgment on Count I of the second amended complaint.

V

Defendant Dauphin Bank next says it is entitled to judgment on Plaintiff Brantley Partners's claim for breach of fiduciary duty. Here, the Court must decide whether Dauphin Bank's relationship with Brantley Partners ever rose to a level of trust and confidence beyond the creditor-debtor relationship.

Under Ohio law, in the commercial context, no fiduciary duty exists between a creditor and debtor. In *Umbaugh Pole Bldg. Co., Inc. v. Scott*, 58 Ohio St.2d 282, 390 N.E.2d 320 (1979), the Supreme Court of Ohio stated that the creditor-debtor relationship fails to create a "fiduciary relationship." The court stated: "The relationship of a debtor and creditor without more is not a fiduciary relationship. A fiduciary relationship may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reposed." *Id.* at 284, 390 N.E.2d 320.

Plaintiff Brantley Partners claims that representatives of Dauphin Bank orally agreed to hold the surety agreement in escrow until the closing of the Transmodal–Goodway transaction. As discussed, telephone conversations between Pinkas and

---

1. The April 30, 1996 letter states:

    The purpose of this letter is to provide the Bank's consent to the transaction(s) and set for [sic] the terms and conditions under which the Bank will maintain certain term debt and letters of credit:

    \* \* \* \* \* \*

    8. As a condition of the Bank's agreements outlined in this letter, Goodway Transport, Inc. will pay in cash at settlement a commitment fee of $10,000 . . .
    The Bank's consent(s) and agreements for the maintenance of term debt and letters of credit post-settlement are contingent upon the parties entering into mutually acceptable documentation, including the Commercial Loan Note Modification Agreements enclosed herewith and the execution and delivery by Transmodal Corporation and Brantley Venture Partners II, L.P. of appropriate Suretyship Agreements, together with necessary authorizing resolutions.

Plaintiff's Exhibit A, Letter at ¶ 8.

2. In her deposition, Jane Kline says:

    Q: I'm going to show you a set of documents marked in a previous deposition as Pinkas Deposition Exhibit A or Defendant's Exhibit A for the Pinkas deposition. I'm sorry, it's Deposition Exhibit C which has already been identified as a suretyship agreement signed by Mr. Pinkas. That document also has the date April 30th, 1996, at the top. Is that your handwriting as well?
    A: Yes, it is.

    \* \* \* \* \* \*

    Q: I guess I'm going to have to ask to see the original of this suretyship agreement at some point as well. Why did you put the date April 30 on the suretyship agreement which is Pinkas Exhibit C?
    A: I don't know. Either I received it that day or it was the date that the rest of the documents were signed.

Kline shows that Defendant Dauphin Bank may have agreed to hold the Agreement until after the merger settled. If so, these communications may have caused Plaintiff Brantley Partners to place Dauphin Bank in a position of special trust, thus creating a fiduciary relationship. Also as discussed, evidence shows that Dauphin Bank may have improperly dated the surety agreement. In her affidavit on December 5, 1997, Ms. Kline acknowledges she dated the Agreement outside the presence of Brantley Partners representatives.

Based upon such evidence, a jury could conclude that Dauphin Bank undertook the responsibilities of an escrow agent. If so, a jury could conclude that Dauphin Bank expanded its duties beyond that of strictly creditor-debtor. Because material issues of fact exist regarding the extent, if any, Dauphin Bank agreed to hold the surety agreement in escrow, summary judgment on this claim is inappropriate. Accordingly, the Court denies Defendant Dauphin Bank's motion for judgment on Brantley Partners's claim for breach of fiduciary duty under Count II.

### VI

■ Defendant Dauphin Bank next seeks judgment on Brantley Partners's claim invoking the doctrine of *ultra vires*. In Count III of the second amended complaint, Plaintiff Brantley Partners claims that its managing general partner, Robert Pinkas, acted outside the scope of his legal authority when he entered the surety agreement favoring Dauphin Bank.[3] In evaluating this claim, the Court considers principles of apparent authority and decides whether Plaintiff Brantley Partners represented to Defendant Dauphin Bank that Pinkas was authorized to bind the partnership.

The Restatement (Second) of Torts, § 159, outlines a principal's liability in cases of agent apparent authority:

A disclosed or partially disclosed principal is subject to liability upon contracts made by an agent acting within his apparent authority if made in proper form and with the understanding that the apparent principal is a party. The rules as to the liability of a principal for authorized acts, are applicable to unauthorized acts which are apparently authorized.

Restatement (Second) of Torts, § 159 at 375. A principal generally remains liable even if the acts of the agent are unauthorized. Section 161 says:

A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized.

Restatement (Second) of Torts, § 161 at 378.

Upon review of the record, the Court finds evidence that Robert Pinkas had authority to transact business with Defendant Dauphin Bank, including executing the surety agreement on behalf of Plaintiff Brantley Partners. When asked by Dauphin Bank to present evidence of the scope of Pinkas's authority, Dauphin Bank received documents representing Pinkas's authority to bind the partnership. In her affidavit, Jane Kline states:

I wrote to Mr. Robert Pinkas on April 24, 1996, and on May 16, 1996, and asked him to indicate the person(s) authorized to sign the Suretyship Agreement for Brantley II.... The only documents which the Bank received concerning the authority of Mr. Robert Pinkas to sign the Suretyship Agreement were the documents hereto collectively annexed as Exhibit "B."

Plaintiff Brantley Partners's partnership agreement outlines the authority of the general partner and is signed by Pinkas, as general partner. The copy of Dauphin Bank's Partnership Certification and Autho-

---

**3.** Plaintiff Brantley Partners specifically argues that Robert Pinkas lacked authority to bind the partnership to the Agreement because Brantley Partners's partnership agreement prohibits the general partner from binding Brantley Partners to a company in which the partnership does not hold a current ownership interest.

rization Form, dated May 23, 1996, identifies Pinkas as the partnership's agent authorized to transact business with Dauphin Bank. Brantley Partners does not contradict or dispute this evidence. Nor does Brantley Partners give evidence showing Pinkas's authority was otherwise limited.

Considering this evidence, the Court concludes that Robert Pinkas either had, or appeared to have, authority to bind Brantley Partners under the surety agreement. Accordingly, the Court grants Defendant Dauphin Bank's motion for summary judgment on Brantley Partners's claim of *ultra vires* under Count III.

## VII

■ In Count IV of the second amended complaint, Brantley Partners alleges that Dauphin Bank had "superior knowledge" of Goodway's poor financial situation and purposefully withheld this information from Brantley Partners to induce Brantley Partners into providing the surety agreement.

■ To state a claim for fraudulent inducement under Ohio law, a party must show: (1) a false representation concerning a fact material to the transaction; (2) knowledge of the falsity of the statement or utter disregard for its truth; (3) intent to induce reliance on the misrepresentation; (4) reliance under circumstances manifesting a right to rely; and (5) injury resulting from the reliance. *Burr v. Board of County Comm'rs of Stark County,* 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986) (citing *Cohen v. Lamko,* 10 Ohio St.3d 167, 169, 462 N.E.2d 407

(1984)). Allegations of fraud must be proven by clear and convincing evidence. *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954). Furthermore, any pleading alleging fraud must state the claim with specificity. Fed.R.Civ.P. 9(b).

In the instant case, the evidence suggests that the Transmodal Company did not solely rely on Defendant Dauphin Bank for financial information about Goodway. Rather, the deposition testimony of Transmodal's President, Paul Misch, shows that Transmodal relied on legal counsel from the law firm of Brouse & McDowell in Akron, Ohio, and the accounting expertise of Ernst & Young. The record also provides I evidence that the Transmodal Company received financial information about Goodway's financial condition directly from Goodway, and that Transmodal supplied this information to Robert Pinkas at Brantley Partners.[4] This evidence shows that Brantley Partners had direct and independent access to Goodway's financial information and that Brantley Partners, likewise, did not solely rely on Dauphin Bank for this information.

The record fails to identify specific instances where Defendant Dauphin Bank made misleading or false statements to Plaintiff Brantley Partners. The record likewise does not show that Dauphin Bank purposefully prevented anyone at Brantley Partners from learning about the financial status of either Goodway's president, Gailyn Larsen, or the company itself.[5] The record also lacks evidence as to why, if at all, Dauphin Bank had

4. At his deposition taken December 15, 1997, Paul Misch says:
   Q: Any other consultants? I don't mean to pry into attorney/client matters. I don't want to do that at all. Did you have outside accountants helping you?
   A: Ernst & Young.
   Q: Before I get to that, what was their role in your negotiations with Goodway?
   A: They were reviewing the financial statements that the Goodway officers were presenting and looking at the projections for next year.

5. Defendant Dauphin Bank relies on THE RESTATEMENT (SECOND) OF TORTS, § 547—Recipient Relying On His Own Investigation. This section provides:

(1) Except as stated in Subsection (2), the maker of a fraudulent misrepresentation is not liable to another whose decision to engage in the transaction that the representation was intended to induce is not caused by his belief in the truth of the representation but is the result of an independent investigation made by him.

(2) The fact that the recipient of a fraudulent misrepresentation is relying upon his own investigation does not relive the maker from liability if he by false statements or otherwise intentionally prevents the investigations from being effective.

Restatement (Second) of Torts, § 547 at 105–06.

a duty to disclose such information to Plaintiff Brantley Partners.[6]

Upon review of the record, the Court concludes that Brantley Partners fails to give evidence sufficient to support a claim for fraudulent misrepresentation or inducement. First, Brantley Partners fails to state its claim for fraudulent inducement with particularity in the complaint. Second, Brantley Partners fails to give evidence that Defendant Dauphin Bank intentionally withheld financial information from Brantley Partners to induce the partnership into executing the Agreement. Finally, Brantley Partners does not show reliance. Because the evidence fails to support Plaintiff Brantley Partners's claim for fraudulent inducement, the Court grants Dauphin Bank's motion for judgment on Count IV.

## VIII

Having decided Dauphin Bank's motion for summary judgment, the Court turns to Plaintiff Brantley Partners's motion for partial summary judgment. In its motion, Brantley Partners says it is entitled to judgment because (1) the surety agreement with Defendant Dauphin Bank is void for lack of adequate consideration, and (2) Dauphin Bank's promissory estoppel defense fails because the surety agreement only promised Brantley Partners would secure letters of credit for the entity created *after* the Transmodal–Goodway went through, not before. Here, the Court first decides whether the Agreement was supported by consideration. Then the Court decides if Defendant Dauphin Bank reasonably relied on Plaintiff Brantley Partners's promise under the Agreement.

■■■ A valid contract consists of an offer, an acceptance, and consideration. Absent any of these essential elements, an agreement will fail and there will be no contract. Under Ohio law, "consideration consists of either a benefit to the promisor or a detriment to the promisee." *Carlisle v. T & R Excavating, Inc.*, No. 2616–M, 1997 WL 669754, at * 3 (Ohio App.9th Dist. Oct. 15, 1997). The Restatement of Contracts, § 71, outlines the types of exchange sufficient to create consideration, and provides:

(1) To constitute consideration, a performance or a return promise must be bargained for.

(2) A performance or promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.

(3) The performance may consist of (a) an act other than a promise, or (2) a forbearance, or (3) the creation, modification, or destruction of a legal relation.

6. Defendant Dauphin Bank relies on The Restatement (Second) of Torts, §§ 550 and 551. Section 550—Liability for Fraudulent Concealment, says:

One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.

Section 551—Liability for Nondisclosure, says:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or to refrain from action in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him ... because of a fiduciary other similar relation of trust and confidence between them; and

(b) matters known to him ... to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade of other objective circumstances, would reasonable expect a disclosure of those facts.

Restatement (Second) of Torts, §§ 550, 551 at 118–19.

(4) The performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person.

Restatement (Second) of Contracts, § 71.

■ The benefit or detriment underlying an agreement does not need to be significant to create consideration. "In fact, a benefit need not even be actual, as in the nature of profit, or be as economically valuable as whatever the promisor promises in exchange for the benefit: it need only be something regarded by the promisor as beneficial enough to induce his promise." *Carlisle*, at *3 (citations omitted). Furthermore, parol evidence may be used to prove the existence of consideration. *Mangano v. Dawson*, No. 93–C–72, 1995 WL 358685, at *3–4 (Ohio App.7th Dist. June 13, 1995). Although the question of whether a contract is supported by consideration is a proper question for the court, as a general rule, courts should not inquire into the "adequacy of consideration once it is found to exist." Rather, the matter of adequacy of consideration is left to the parties when making their agreement. The matter for the court is limited to whether the parties "bargained" for consideration. *Carlisle*, at *3.

■ In the instant case, the evidence suggests that as part of the merger transaction, Defendant Dauphin Bank received approximately $4.5 million from Allied as payment on Goodway's debt obligations. In exchange for these funds, Dauphin Bank assigned Allied its interest in Goodway's accounts receivable. This assignment occurred before the Transmodal–Goodway negations collapsed. Although this shows consideration supporting Dauphin Bank's agreement with Allied, the record is less clear as to what consideration supports the Agreement between Dauphin Bank and Brantley Partners.

Defendant Dauphin suggests that Brantley Partners stood to financially benefit from Transmodal's acquisition of Goodway. However, the record lacks specific evidence regarding Brantley Partners's financial relationship with Transmodal and, more importantly, how Brantley Partners would benefit from the surety agreement. There is little evidence showing that Brantley Partners had an agreement with Transmodal to receive money once the merger settled. There is also little evidence showing the reasons why Brantley Partners chose to be a surety for Goodway's letters of credit.

Brantley Partners suggests that the surety agreement is not supported by consideration because the surety agreement was only to take effect after the merger settled, and that Brantley Partners agreed to be surety only for the new entity created by the merger. A review of the surety agreement, however, reveals that the Agreement specifically lists "Goodway Transport, Inc." as the underlying borrower to which Brantley Partners gives surety. This evidence contradicts Brantley Partners's contention that it was only to be surety for the entity created by the merger. There is no evidence on what the new entity would be called. In this regard, the Court finds a material issue exists regarding whether the surety agreement is supported by consideration.

Because the record reveals material issues of fact on this issue, summary judgment is inappropriate. Accordingly, the Court denies Plaintiff Brantley Partners's motion for summary judgment on the claim that the Agreement fails for lack of consideration.

## IX

Alternatively, Plaintiff Brantley Partners says that even if the surety agreement is supported by consideration, Dauphin Bank's promissory estoppel defense must fail because Dauphin Bank does not give sufficient evidence that Brantley Partners's promise under the surety agreement actually caused Dauphin Bank to detrimentally rely on Brantley Partners's promise.

■ In Ohio, courts traditionally invoke the doctrine of promissory estoppel to "prevent a person from denying or asserting anything that by that person's own actions, words, representations or deeds [is] contrary to truth." *Columbus Trade Exchange v. AMCA Int'l Corp.*, 763 F.Supp. 946, 952 (S.D.Ohio 1991). Promissory estoppel "aids in the enforcement of promises by, in effect,

supplying the essence of 11 consideration where necessary to prevent injustice." *Blackwell v. International Union, United Auto Workers,* 9 Ohio App.3d 179, 182, 458 N.E.2d 1272 (1983). To establish promissory estoppel, the promisee must show four elements: (1) a clear and unambiguous promise; (2) reliance by the party to whom the promise is made; (3) the reliance is reasonable and foreseeable; (4) the party asserting estoppel must be injured by its reliance. *Moore v. Kings Island Co.,* No. CA97–09–097, 1998 WL 230038, *2 (Ohio App.12th Dist. April 6, 1998).

■ In making its case for estoppel, Dauphin Bank says: (1) that Brantley Partners promised Dauphin Bank it would guarantee Goodway's debts by executing the suretyship agreement in exchange for Dauphin Bank's assigning its interest in Goodway's receivables to Allied; (2) that Dauphin Bank relied on the language in the Agreement indicating that Brantley Partners, as the surety, would make Dauphin Bank whole if Goodway failed to satisfy its obligations; (3) that Dauphin Bank's reliance on the Agreement was reasonable and foreseeable since Brantley Partners knew the surety agreement protected Dauphin Bank; and (4) that if Dauphin Bank cannot collect on the Agreement, it will be injured because it will not have recourse to collect on Goodway's indebtedness.

It is clear that Defendant Dauphin Bank assigned its rights in Goodway's accounts receivable before the close of the Transmodal–Goodway transaction. However, it is less clear whether Dauphin Bank did so knowing that the transaction was not definite. In his deposition, Dauphin Bank Senior Vice President, Eric Rebert, remarks that Dauphin Bank understood the deal was to occur at the close of the merger.

Q: Your understanding was at the time of settlement there would be a transaction in which Transmodal would acquire Goodway, Allied or somebody would transfer funds to the bank, the bank would release its line of credit, issue a new instrument that would be backed by Transmodal and Brantley to cover existing letters of credit for 90 days; is that a fair characterization?

A: Yes. . . .

Rebert's testimony shows that Dauphin Bank may have understood that the assignment of the receivables was to occur only at the close of the deal, and that surety agreement was contingent on settlement of the Transmodal–Goodway acquisition.

However, other evidence shows Brantley Partners may have fully understood the effect of the surety agreement and that the Agreement was necessary to the success of the Transmodal–Goodway merger. The deposition testimony of Robert Pinkas, shows that Brantley Partners may have agreed to be bound by the terms of the Agreement

Q: Could you get the Surety Agreement again?

A: Yes.

Q: Could you read the very last sentence?

A: "Intending to be legally bound?"

Q: Yes.

A: "Intending to be legally bound hereby, the Undersigned have set their respective hands and seals the day and year first above written."

Q: Did you read that at the time you signed the suretyship agreement?

A: I don't think so. It wouldn't have mattered.

Q: Why wouldn't it have mattered?

A: Because I specifically—I sign a lot of things that I give to somebody in contemplation of a transaction, where even though the document itself confers some form of contract, the contract isn't complete until everybody else signs.

Q: Was someone else going to sign the suretyship agreement?

A: This one document was part of the series of documents for a closing, and it was contingent upon everyone else signing their documents.

Considering the evidence above, the Court finds genuine issue of fact regarding the circumstances and the extent to which the parties agreed to be bound under the Agree-

ment. Material issues of fact also exist regarding the extent to which Dauphin Bank relied on Brantley Partners's understanding of the surety agreement. Because genuine issues of material fact exist, summary judgment is inappropriate. Accordingly, the Court denies Plaintiff Brantley Partners's motion for judgment on Dauphin Bank's promissory estoppel defense.

For the reasons set forth above, the Court denies Defendant Dauphin Bank's motion for summary judgment on Brantley Partners's claims for a declaratory judgment on the validity of the suretyship agreement (Count I) and for breach of fiduciary duty (Count II). The Court grants Dauphin Bank's motion on Brantley Partners's claims of *ultra vires* (Count III) and for fraudulent inducement (Count IV). The Court denies Plaintiff Brantley Partners's motion for partial summary judgment on Dauphin Bank counterclaim for enforcement of the suretyship agreement.

IT IS SO ORDERED.